FOURNET, Chief Justice.
This is a tort action involving an inter-sectional collision that occurred in Natchi-toches, Louisiana, between a 1955 Buick automobile operated by the plaintiff, Hasty B. Scott,[1] who was proceeding west on Church Street, and a 1959 Chevrolet sedan driven by Barbara Troquille, the minor daughter of the defendant John A. Troquille, who was proceeding in a southerly direction on Fourth Street. The matter is now before us on a writ of certiorari, granted on the application of the defendant Troquille and the liability insurer of his car, the Grain Dealers Mutual Insurance Company, to review the judgment of the Court of Appeal for the Third Circuit that affirmed the judgment of the district court in favor of the plaintiff in the amount of $5,000 for personal damages and $1,013.15 for special damages. " See, La.App., 154 So.2d 796. The application was granted because of the apparent conflict existing between the decision complained of here and that of the Court of Appeal for the Second Circuit in National Retailers Mutual Insurance Company v. Harkness, La.App., 76 So.2d 95.
It appears the City of Natchitoches, in 1936, adopted an ordinance in which Fourth Street was given the right-of-way over Church Street. However, it was shown by the evidence that at the time of the accident, and long prior thereto, a stop sign had been erected by the city officials on the east side of Fourth Street and several feet removed from Church Street. As a result, it had been generally recognized by the citizens of Natchitoches that Church Street was the favored street.
In resolving the issues of this case, the appellate court, as had the trial court, took cognizance of the apparent conflict between the decision in the Harkness case and that *63 of the First Circuit in Dufore v. Dauger-eaux, La.App., 122 So.2d 656,[2] and followed the rationale of the decision in the Dufore case, which it considered “involved facts similar to the one in the instant case.”
While there is some language in the Harkness and Dufore cases that appears to he in conflict, their holdings are not necessarily so, as they are easily distinguishable from both a legal and factual standpoint. In the former case counsel contended Miss Harkness” was proceeding on a highly favored street” and that “traffic crossing at the intersection [was] required to stop before entering” it. In rejecting this contention the appellate court pointed out there was “not the slightest evidence in the record” reflecting that East-and-West (on which Miss Harkness was travelling) was a “highly favored street;” further, there was no “indication of any nature that traffic on Lewisville” (on which one of the three cars involved in the accident was travelling) approaching the intersection where the accident occurred “was required to stop.” In the latter case defendant contended he was not liable because it was not proved the stop signs regulating traffic on Sunset Street had been placed there pursuant to statute or ordinance, and he therefore had the right-of-way since he was in the vehicle approaching from plaintiff’s right. In rejecting this contention the court stated theré was “no evidence to indicate that the stop-signs were not properly placed pursuant to Church Point ordinance or State statute.” Hence, the statement in the Dufore case to the effect that “In allocating fault between motorists involved in an accident, it seems to us that reasonably prudent motorists should properly rely upon such stop-signs and can properly expect oncoming motorists also to rely upon them,” is dicta. Yet this is the statement upon which both courts below based their decision, without giving any consideration whatsoever to the facts of the case.[3]
The Court of Appeal for the Third Circuit, in affirming the judgment of the district court in the case now under consideration, clearly intended each case should be decided according to its own facts, though not expressly saying so, for it observed: “We do not intend to hold that the mere placing of stop signs by municipal officials, without authority of an ordinance, is sufficient to establish favored streets. * * * YVe intend herein to hold only that, under the circumstances of this case, defendant’s daughter was negligent, and plaintiff was free of negligence.” Although we granted this writ primarily because of the alleged conflict between the decisions in the Harkness case and instant case, after reviewing the record, as we are required to do under the constitution once the writ is granted,[4] we find the evidence does not support the appellate court’s conclusion that the “plaintiff was free from negligence.”
When Miss Troquille was called under cross-examination by the plaintiff, she readily admitted she knew of the stop sign at Fourth Street and also that she, as well as the public in general, recognized Church Street as having the right-of-way over Fourth. She further testified that at the time of the accident she was going to work, travelling the same route she daily pursued, and, because of a very heavy rain, she had in operation both windshield wipers and the parking lights of her automobile; that *64 upon reaching the stop sign before crossing into Church Street she stopped her car, and, observing no oncoming traffic in either direction after having looked both ways, moved slowly forward, again looking to her left to see if there were any approaching vehicles. Seeing none, she felt secure in entering the intersection and proceeded to execute a left turn. Just as she had almost completed the turn, with the front end of her car turned toward town, the two cars collided, plaintiff’s vehicle striking hers on its left front toward the door.
The plaintiff, the only other eye witness, testified under direct examination that at the time of the accident she operated three connecting businesses, namely, a cafe known as Hasty’s Place, the West End Liquor Store, and also a club she ran under the name of Hasty’s Club. The store not only sold package liquor and beer, but also supplied her club with these products. As a result of her ownership of these businesses, she was required to drive on Church Street frequently, and, on the day of the accident, was returning from the “Saveway” store, where she had purchased supplies for the cafe. She stated she was driving between IS and 20 miles an hour in the right-hand lane of Church Street, a heavy mist or light rain falling at the time, and that she first observed the Troquille car while it was some distance away on Fourth Street, before it reached the stop sign, and believed, because it was moving slowly toward Church Street, it would stop. It was when she discovered Miss Troquille was turning into Church Street that her car collided with the Troquille automobile, the left front of the Buick striking the left front of the Troquille car.
However, when the plaintiff returned to the stand after lunch, on redirect examination she repudiated her previous testimony. In response to carefully phrased leading questions of her counsel,[5] she changed her version of the manner in which the accident occurred, and stated, in effect, she saw the Troquille vehicle momentarily for the first time just as she approached the intersection, and as it was then moving almost immediately into the intersection it was too late for her to apply her brakes and, as a consequence, she struck it.
Later, under pressive cross-examination, after having been repeatedly asked by defense counsel if she had not testified as a fact on the stand in the morning she saw the Troquille car approaching some distance from the stop sign on Fourth, and, thinking it was going to stop, kept moving, finally answered: “I don’t think I said that,” explaining she had not seen the car stop at all; that when she first saw it, it was near the *65 stop sign moving slowly, but she could not estimate its speed. Finally, she admitted she was right on the car when she saw it.
It is difficult to account for plaintiff’s sudden change in her version of how the accident happened after she had testified so positively in the morning unless she became apprised of the fact that the physical facts brought out by her own witnesses — police officers and city officials, as well as photographs — clearly showed that when driving on Church Street toward Fourth the view to her right was obstructed to the extent it was impossible for her to see the defendant’s car some distance from the stop sign, as she had testified in the morning. An examination of this witness’ testimony on the whole is unimpressive. We find it lacking in corroboration in every material aspect.
On the other hand, the honesty and sincerity of the testimony given by Miss Tro-quille is apparent. Her statement that she stopped at the stop sign was not controverted. We therefore have no reason to disbelieve it. The rest of her testimony was fully corroborated in every respect by police officers who were called to the scene immediately after the accident, and who testified it was raining heavily at the time of the accident and had been for some time prior thereto. After examining the position of the cars following the collision, Officer Radial was of the opinion the point of impact had occurred approximately in the middle of the intersection when Miss Troquille “was a little on the east side of the center line making her turn like she should be,” as she had crossed the center line and was turned toward town; further, that her automobile had been struck on the left front by plaintiff’s vehicle.
Conceding, if we must, that Miss Tro-quille was negligent in failing to see what she should have seen, and in believing she was secure in making the turn, we think the facts of the case unmistakably show the plaintiff was equally negligent, and that had she exercised the slightest degree of care she could have averted the accident. It is evident that if the plaintiff had approached this admittedly dangerous intersection [6] during a heavy rain storm with the degree of caution expected of a prudent and careful motorist under similar circumstances, and seen what she should have seen, she could have averted the accident by simply applying her brakes or turning slightly to the right, for, at the time the Troquille vehicle entered the intersection, the plaintiff must have been from 50 to 60 feet away, considering the rate of speed at which she was travelling, for the Troquille car, admittedly moving slowly, had actually gone a distance of 20 to 30 feet into the intersection at the time of impact.
For the reasons assigned, the judgments of the trial court and the Court of Appeal for the Third Circuit are annulled, and the plaintiff’s suit is dismissed, at her cost.

. The Buick was owned by plaintiff’s daughter.

. Writs were not sought in the Harkness case. In the Dufore case they were denied.

. In justice to our learned brothers below, it should be pointed out they received little if any light from counsel on this aspect of the case.

.Section 11 of Article YII of the Constitution of 1921, as amended, provides in part: “It shall be competent for the Supreme Court to require by writ of cer-tiorari, or otherwise, any case to be certified from the Courts of Appeal to it for review, with the same power and, authority in the ease as if it had been carried direetly by appeal to the said court * * (The emphasis has been supplied.)

. “Mr. Brittain.:
“Q. Now, Hasty, there are a couple of questions that I’m not sure how you answered, first of all, if you will, describe in your own words how this accident occurred again?
“A. Well, I was going west on Church Street and by the time I was down the street far enough to see the intersection it was a car, but the car was still moving and I thought — I mean, I didn’t know which way — whether it was going to stop or not but I just saw the car moving, and when I went to apply brakes the car was right there.
“Q. Well, aren’t there a lot of bushes to the right of that intersection there? “A. It’s a good many.
“Q. Now, could you see that car before it came out from behind those bushes?
“A. I could see it after it was from the bushes but that’s not very far.
“Q. And it was moving at all the time you saw it, you say?
“A. Yes, sir.
“Q. Now, if you had put on your brakes at the moment you first saw that ear, let’s just assume for a minute that you thought it was going to stop, if you had put on your brakes at the moment you first saw that ear could you have stopped before you got to that intersection?
“A. It was right there.
“Q. And as I understand it now, the minute that it actually came on into the intersection, you tried to get on your brakes but you hit it'before your brakes even caught, is that right?
“A. That’s right.
“Q. Well, then -you just saw it then momentarily before it came out into the intersection, is that right?
“A. Yes, sir.”

. All witnesses testified the crossing was dangerous. The Chief of Police further stated this blind corner intersection, where approximately 7 accidents had occurred during the previous year and a half, had been designated as one needing corrective measures.